## 11,000 ACRES OF LAND, MORE OR LESS, SITUATED IN SMITH COUNTY, TEX., et al. v. UNITED STATES.

### No. 11444.

Circuit Court of Appeals, Fifth Circuit.

Dec. 21, 1945.

SIBLEY, Circuit Judge, dissenting in part.

Thos. B. Ramey, of Tyler, Tex., and W. M. Streetman, of Houston, Tex., for appellants.

J. Edward Williams, Acting Head, Lands Division, Dept. of Justice, Wilma C. Martin, and Roger P. Marquis, Attorneys, Department of Justice, all of Washington, D. C., W. Dewey Lawrence, Sp. Atty., Dept. of Justice, of Tyler, Tex., Sam F. Leslie, Sp. Atty., Dept. of Justice, of Denison, Tex., and Steve M. King, U. S. Atty., of Beaumont, Tex., for appellee.

Before SIBLEY, WALLER, and LEE, Circuit Judges.

LEE, Circuit Judge.

Proceedings were instituted by appellee on March 26, 1943, to condemn 11,000 acres of land situated in Smith County, Texas, for use in connection with the Tyler Air Force Replacement Training Center; and this controversy, arising therefrom, involves a tract of 91 acres included in the lands condemned, owned in fee by Brady P. Gentry and Carl Shamburger, on which there is an oil and gas lease owned by the General Crude Oil Company, all three of whom are appellants here. The estate taken by the Government was set forth in the petition for condemnation in these words: "(6). That the estate to be taken in and to said lands is a term for years ending June 30, 1943, together with the right to extend said term for additional yearly periods thereafter during the existing national emergency, at the election of the Secretary of War, which election shall be signified by the giving of notice at any time prior to the expiration of the term hereby taken or subsequent extensions thereof, subject, however, to existing easements for public roads and highways, for public utilities, for railroads and for pipe lines."

On April 1, 1943, the Government took possession of the 91 acres, and thereafter extended the term to June 30, 1944. On

November 19, 1943, a declaration of taking was filed for the period commencing April 1, 1943, and ending June 30, 1944, extendable yearly during the emergency. At the time of the trial the term had been extended to June 30, 1945.

In February, 1945, the commissioners appointed to fix compensation made a report in which the compensation for the 91 acres was fixed at $20,475, allotted $11,375 to the leasehold estate and $9,100 to the land owners. Objections to the commissioners' award were filed by the Government, and a jury trial was requested; thereupon the fee owners and the leasehold owner filed answers claiming compensation in the sums of $15,000 and $25,000, respectively. During the trial the leasehold owner tendered evidence to prove the fair market value of its estate as of March 26, April 1, and November 19, 1943, and to prove the depreciation and diminution in the fair market value of the leasehold estate on and after those dates resulting from the condemnation. The trial court stated that only a fair cash rental value on an indeterminate lease was recoverable, and restricted the evidence to proof of a fair cash annual rental both as to the lessee's rights under its oil and gas lease, and the fee owners' rights as to the land. At the close of the trial, the judge in his charge stated that "the only evidence was that the annual rental was $1.50 per acre," and the jury returned a verdict awarding $1.50 per acre as annual rental for use of the surface of the 91 acres to the fee owners and a like sum as annual rental to the leasehold owner. Accordingly judgment was entered upon the verdict providing that $273 should be paid annually from April 1, 1943, $136.50 to the oil company and $136.50 to the fee owners; and the jury having found that the Secretary of War had elected to continue the term of taking until June 30, 1945, the judgment provided for the payment of said sums to that date. From the judgment appellants prosecuted this appeal.

In this court two questions are presented: (1) whether the trial court applied a proper measure of compensation, and (2) whether the property taken was properly valued as of the date the United States took possession.

The oil and gas lease was executed on May 10, 1937, by the then owner of the fee, for a primary term of ten years, and covered a total of 233.2 acres of land, of which the tract under consideration is a part. It provided for annual delay rentals in lieu of drilling operations in the sum of $1 per acre. The day following the execution of the lease, it was assigned by the lessee to the General Crude Oil Company, the present owner and holder thereof, and by mesne conveyances prior in date to March 26, 1943, the fee title, subject to the lease, was acquired by Gentry and Shamburger, the present fee owners. At the time the condemnation suit was originally filed, a deeptest well for the discovery of oil and gas was being drilled within less than one and a half miles of the 91 acres. It was abandoned on account of mechanical difficulties in drilling operations. On April 19, 1943, a permit to drill a well was granted by the Railroad Commission of Texas to the General Crude Oil Company, following which a request was made of the War Department for permission to drill. The request was denied in a letter from the Department dated June 11, 1943. At the time of the trial, the uncontradicted evidence showed that some six oil wells had been drilled and completed in the area, all producing oil, five from sands at a depth of approximately 7,000 feet and one from sand at a depth of 9,000 feet.

The judgment on the jury's verdict was entered on May 10, 1945. At that time, exactly eight years of the ten-year lease term had expired. The appeal was taken on July 7, 1945. Since there is nothing in the record to indicate to the contrary, and the emergency continued to exist, it may be assumed that the Government extended the taking for an additional year to June 30, 1946. On June 30, 1946, the lease will have an unexpired term of ten months and ten days. If the Government again should elect to extend the taking for a year from July 1, 1946, the lease during that period would expire and thereupon become a total loss.

The leasehold owner under its lease unquestionably had the absolute right to explore for and exploit the oil and gas in the 91 acres, and this right it could exercise or could transfer to another who could exercise it. It is true that the Government has not physically taken any of the oil and gas, but its successive extensions for periods of one year have deprived the leasehold owner of rights it enjoyed to the extent of each year taken, and one more extension will result in the total destruction of the leasehold estate. A mere statement of these facts shows the fallacy of the

"fair-annual-rental" theory upon which the trial court instructed the jury to fix compensation.

■ It is no answer to say that the Government has not profited or realized anything from the taking, for "the courts have held that the deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking." United States v. General Motors Corporation, 323 U.S. 373, 65 S.Ct. 357, 359, 156 A.L.R. 390. Compensation in cases of this kind frequently can be measured only in the depreciation and diminution in the market value of the right enjoyed, to be arrived at by deducting from the value of the leasehold immediately prior to condemnation what probably could have been obtained by an assignment of the lease immediately after the taking; that is, "the sum that would in all probability result from fair negotiations between an owner who is willing to sell and a purchaser who desires to buy." Brooks-Scanlon Corporation v. United States, 265 U.S. 106, 123, 44 S.Ct. 471, 475, 68 L.Ed. 934. The equitable way to ascertain the compensation due to the leasehold owner, since the Government limits its taking to periods of one year with the right to take for additional one-year periods during the emergency, is to determine the loss sustained for each year's taking and for the court below during the life of the lease to retain jurisdiction in order to determine such loss. United States v. Certain Parcels of Land, D.C., 55 F.Supp. 257, 263; In re Condemnation of Lands for Military Camp, D.C., 250 F. 314, 315. The damage following each year's taking may be arrived at by the jury finding the market value of the lease prior to each taking and the market value following the taking. The depreciation would represent the damage suffered by the lessee for each one-year period. Such a procedure would eliminate undue speculation, minimize uncertainties, and cause the parties to deal the one with the other as of conditions present at the time of and following each taking. In the absence of market value, the value could be determined by the opinion of experts or by other competent means.

On remand, in the present circumstances, the procedure can be simplified by treating the successive taking over three one-year periods as a taking for a term of years ending June 30, 1946, with the option to extend for an additional year. The difference in the market value of the lease before April 1, 1943, and following the last taking on July 1, 1945, will represent the damage to the leasehold estate, and the court should retain jurisdiction in order to assess the damages should the Government elect to extend the taking one year from July 1, 1946.

The problem might easily be solved by propounding the following, or substantially similar, questions to the jury:

1. What was the market value of the oil and gas lease owned by the defendant, General Crude Oil Company, at the time of taking possession, to wit, April 1, 1943, assuming that the lease of General Crude Oil Company had four years, one month, and nine days to run?

2. What was the market value of said lease on June 30, 1945, at which time the lease had one year, ten months, and ten days to run?

■ The fee owners' property at the time of the original taking on or about April 1, 1943, was covered by an oil and gas lease which provided, over a term of ten years, for the payment to them of $1 per acre per year rental in lieu of drilling. If the lessee failed to drill but maintained the lease, they collected $1 per acre every year, and at the end of ten years, in default of drilling, the property would be returned to them free of the lease. It is clear, therefore, that the only damage that they have suffered has been that of being deprived of the use of the surface of the property. The evidence is undisputed that $1.50 per acre per annum fixed by the jury is a fair annual rental for this use of the 91 acres.

■ The second issue is whether the estate taken should have been valued as of April 1, 1943, when the Government took possession, as found by the trial court, or whether the proper date was November 19, 1943, when the first declaration of taking was filed. We regard it as well settled that, either where no declaration of taking is filed or where, as here, the declaration of taking is filed on a date subsequent to the actual passing of possession, the market value of the property taken should be determined as of the date possession was acquired. United States v. Lynah, 188 U. S. 445, 23 S.Ct. 349, 47 L.Ed. 539; Seaboard Air Line Ry. Co. v. United States, 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664; United States v. Rogers, 255 U.S. 163, 41 S.Ct. 281, 65 L.Ed. 566; Cf. Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78

L.Ed. 1236; United States v. 6.87 Acres of Land, 2 Cir., 147 F.2d 351.

The judgment appealed from as to Gentry and Shamburger, fee owners, is affirmed; as to the General Crude Oil Company, leasehold owner, the judgment is reversed, and the cause is remanded for proceedings not inconsistent with the views herein expressed.

SIBLEY, Circuit Judge (dissenting in part).

In the affirmance of the judgment as to Gentry and Shamburger I concur. In the reversal of the judgment as to General Crude Oil Company I concur also, but I do not agree to the instructions given to govern a new trial. This case seems to be the first determined by an appellate court which deals with the measure of compensation when property is taken by the United States for a short period only but with an asserted right of renewal for annual periods during the emergency; and the first to deal with the compensation due the owner of an oil and gas lease which is interfered with but not expressly taken. I regard it as important in both these aspects.

This temporary or indefinitely renewable taking, as contrasted with a final and complete taking of a definite interest in or the whole of property, is probably authorized by Section 201 of the Second War Powers Act, 56 Stat. 177, 50 U.S.C.A.Appendix, § 632, by the words: "The Secretary of War * * * may cause proceedings * * * to acquire by condemnation, any real property, temporary use thereof, or other interest therein * * *" etc. For any kind or degree of taking of private property for public use the Constitution requires that just compensation shall be paid. It does not say when it shall be paid, and it is well settled that it need not be in advance of the taking. It does not say it shall be paid all at once, and where the taking is from year to year, it seems entirely just to hold that it may be ascertained and paid from year to year. The fee owners here do not seem to have any good claim, so long at least as the oil and gas lease continues, to assert any loss arising from the clouding of their title because of the annual option to keep taking the use of the land indefinitely. They have agreed in the lease to be content with a dollar a year per acre as delay rentals for ten years and cannot compel the drilling of a well. The United States always has under the law of eminent domain an option to take anyone's land, on paying compensation. When it seems likely a taking will occur, the owner's right to sell it is of course clouded and interfered with so long as that threat is imminent, but no compensation can be claimed unless and until and so far as his property is taken. I do not think any owner is entitled to measure his compensation for the taking of the temporary use of his property by the temporary loss in its saleable value due to the chance the United States may continue to use it. Perhaps it is not marketable while so situated, but if the owner should be paid its loss of market value, and the next year the property is released and regains its market value, it seems plain that the compensation paid has proved not just. The only way to ascertain the just compensation for the use for an uncertain time of property which for some reason has a peculiar value aside from its value for rent, is to wait until the uncertainty is removed and then ascertain it. Without legislative authority perhaps, private property has often been "commandeered" for emergency public use. It has been customary after the emergency and the restoration of the property to pay what the use was worth and for any physical damage done the property; but not to compensate for speculative gains that might have been made on the property if it had been free. I do not think these fee owners show that anything has been taken from them but the surface use of their lands which they themselves testified was worth what was awarded them. Their minerals remain uninjured in the earth. They have no claim to compensation as respects them.

The leaseholder stands somewhat differently. His property, though an estate in the land, consists in the right to go on the land and explore for gas and oil for a period of ten years, and if he finds it, to remove it under the royalty arrangement. For six years he made no move to explore. After the United States filed a proceeding for condemnation he obtained a permit to drill a well, and the United States refused to allow him to drill on the ninety-one acres whose use was taken. He was free to drill on the 142 adjoining acres included in his lease, but has not done so. Nor has he, so far as appears, sold his lease on the 142 acres. He has paid delay rentals of $1.00 per acre to keep his lease in good standing.

Ninety-one dollars per year compensation would make him whole as to this as respects the ninety-one acres. He can keep his lease going even beyond the ten years by drilling on the free 142 acres. I do not see that his lease has been taken, even as to the ninety-one acres, unless the possession by the United States is extended beyond the term of his lease, and the minerals, if any, revert to the lessors. If the United States, now that the war is over, releases the ninety-one acres, or even consents that he drill on it, he has ample time within the ten year term to explore it for minerals or to sell the lease to others. The evidence indicates that oil has been found some miles away, and there is speculative value in this lease. If oil is found on it next year, or very near to it, the possession by the United States which he claims is damaging him by preventing the sale of the lease will turn out to have made him rich. I think the sensible and just thing as to the lease owner is to hold the condemnation case open till it appears whether the taking did or did not destroy or injure his lease, and then to fix his compensation according to the loss he can then show. A final award should be postponed till the year-by-year taking ceases, or the lease ends.