**TRINITY RIVER AUTHORITY of Texas,
Appellant,**

v.

**Jerry Allen CHAIN et al., Appellees.**

**No. 7010.**

Court of Civil Appeals of Texas.

Beaumont.

Jan. 23, 1969.

Rehearing Denied Feb. 19, 1969.

Lloyd C. Martin, Huntsville, Clark, Thomas, Harris, Denius & Winters, Austin, for appellant.

J. Robert Liles, Conroe, Edward W. Jones, Livingston, for appellees.

PARKER, Chief Justice.

This is a condemnation case arising from the construction of the Lake Livingston Reservoir by Trinity River Authority of

Texas. The property sought to be condemned by the pleadings consisted of fee simple title in and to 280.64 acres of land, save and except therefrom all oil, gas and other fluid or gaseous minerals in, under, and that may be produced from said land, together with the right of ingress or egress for the purposes of exploring, drilling, developing, and producing the same, subject and subordinate, however, to the right of plaintiff to construct, maintain and operate on and over said land, or adjacent thereto, a reservoir for impounding water. Also to be condemned was a flowage easement upon a 5.27 acre strip adjacent to the 280.64 acres. The landowners owned fee simple title to the 280.64 acres and the 5.27 acres. Condemnees also owned the fee simple title to some 70 acres adjoining the flowage easement strip. Original Petition of the Authority was filed September 15, 1966. The Special Commissioners awarded the Condemnees $63,144.00 on November 4, 1966. Condemnees filed objections to the award of the Special Commissioners. The Authority's First Amended Petition for condemnation was filed on August 8, 1967.

Appellees, in their Original Answer, prayed that they be awarded damages which they have suffered by reason of the condemnation of defendants' land and premises by plaintiff herein as follows:

(a) The actual market value of the tract of land condemned and taken by Plaintiff herein, being 285.91 acres, more or less.

(b) The actual market value of the oil, gas, and other minerals in, on, and under the lands condemned, there being in legal effect *an actual taking of such minerals.* (Emphasis ours).

(c) The decrease in market value of the remaining adjoining lands of Defendants, being the difference between the market value of said remaining lands prior to the taking and after the taking by Plaintiff.

On the second day of trial, the Condemnees, in open court, made this waiver:

"MR. LILES: Your Honor, the Defendants have admitted the Authority has the right to condemn, and appropriate the land which they seek to condemn, and the easement which they seek to take.

"At this time the Defendants in open court waive any damages which they might have had or which they may have to the remainder of the land not being taken in fee simple or by easement, and as to such remainder, of course, it is understood that the minerals in, on and under such remainder are a portion of such a remainder, and we are making no claims for damages to the minerals which may lie in, on or under the remainder. Our claim for minerals is limited to strictly the land taken, and in connection with this admission and with this statement, having waived all rights to damages as to the remainder of the land, then the sole issues which remain before the Court and jury are, first, what is the value of the land sought to be taken in fee simple, that is, the 200-acre tract. What is the value of the easement of the 5.27 acre tract before the taking and after the taking, and under the Defendants' theory of the case, what is the value of the minerals under the 280 acres sought to be taken, and the fact that they own additional land adjoining the easement and the land sought to be taken in fee simple, any issue with respect to such remainder now becomes immaterial as a matter of law to the issues which remain before the Court; that any evidence sought to be introduced with respect to the remainder would only be to prejudice the rights of these Defendants in seeking to recover the market value of the land sought to be condemned in fee simple of the easement and of the minerals under the 280-acre tract, and the Defendants now move the Court that in order to avoid any such prejudice that the Authority should be restricted in its interrogation of any witnesses, any arguments made by any of the attorneys, any evidence or exhibits from showing or

referring in any manner to the remainder of land not being condemned here.

"MR. MARTIN: Now, Your Honor, if I understand Judge Liles' motion, he purports to waive damages under the Meyer case to that portion of surface that is remaining plus that portion of the minerals under that portion of surface that is remaining. But he purports to claim damages to the minerals under the 280 acres of land being acquired in fee for purposes of the Livingston Reservoir.

"MR. LILES: No, I am not claiming damages for minerals under the easement, only the 280 acres."

The facts in the instant case being different from the facts in many decisions relied upon by appellant, the Special Issues submitted to the jury and its answers are set forth below:

## "SPECIAL ISSUE NO. 1

From a preponderance of the evidence, what do you find is the reasonable market value of the 280.64 acres of land, exclusive of the minerals, being condemned by the Trinity River Authority of Texas for reservoir purposes, considered as severed land:

ANSWER IN DOLLARS AND CENTS:

ANSWER: $126,000.00

## "SPECIAL ISSUE NO. 2

From a preponderance of the evidence, what do you find is the reasonable market value of the 5.27 acres of land being condemned for flowage easement purposes?

ANSWER IN DOLLARS AND CENTS:

ANSWER: $2,371.50

## "SPECIAL ISSUE NO. 3

From a preponderance of the evidence, what do you find is the reasonable market value of the 5.27 acres of land being condemned for flowage easement purposes after the flowage easement is imposed upon it?

ANSWER IN DOLLARS AND CENTS:

ANSWER: $00.

You are instructed that in answering Special Issues No. 1, 2 and 3, you will determine the market value of the land considering the property in its condition and situation today, and excluding from your consideration any increase in market value, if any, resulting from the announcement of plans for the construction of the proposed Livingston Dam and Reservoir.

## "SPECIAL ISSUE NO. 4

From a preponderance of the evidence, what do you find is the reasonable market value of the minerals under the 280.64 acres of land being condemned for reservoir purposes, immediately before the taking of the surface of the 280.64 acres of land for reservoir purposes?

ANSWER IN DOLLARS AND CENTS:

ANSWER: $3,364.50

## "SPECIAL ISSUE NO. 5

From a preponderance of the evidence, what do you find is the reasonable market value of the minerals under the 280.64 acres of land being condemned for reservoir purposes, immediately after the taking of the surface of the 280.64 acres of land for reservoir purposes?

ANSWER IN DOLLARS AND CENTS:

ANSWER: $00."

Judgment was entered upon the verdict of the jury. Condemnees voluntarily filed a remittitur in the amount of $527.00, as the undisputed evidence is the 5.27 acres would have a market value of $100.00 per

acre after the flowage easement was imposed.

Appellant does not attack the findings of the jury in answer to Special Issues Nos. 4 and 5. With the remittitur of $527.00, appellant does not attack the findings of the jury in answer to Special Issue No. 3.

Trinity River Authority of Texas will be called Authority, appellant, or by its name. The condemnees, Jerry Allen Chain et al, hereinafter will be called condemnees or appellees.

Appellant's first point is:

"The Trial Court erred in permitting Appellees to waive damages to a portion of their remainder and at the same time to recover special damages to another portion of their remainder."

Such point of error is overruled. As phrased, it would appear to be a sound contention.

Appellant asserts "that where the condemning authority takes surface rights only, the underlying mineral estate is either the remainder or a portion of the remainder if the taking thereof has not included all of the surface rights of the landowner." As authority for such contention, appellant cites City of San Augustine v. Johnson, 349 S.W.2d 653 (Civ.App., 1961, error ref. n. r. e.), where the condemning Authority sought to condemn 40.8 acres out of a 61 acre tract, excluding oil, gas, and other minerals, but Special Issue No. 1 in such case asked the jury to find the market value of the 40.8 acres of land. This would include the minerals. The evidence in City of San Augustine v. Johnson, supra, being that the market value of the minerals under such tract was $10.00 per acre, the Court of Civil Appeals required a remittitur of $408.00. Why? Because there was no evidence that the covering of the condemned land with water would prevent directional drilling for oil and gas from the remaining portion of the 61 acre tract as effectively as if conducted on the 40.8 acres. There-

fore, the mineral estate under the 40.8 acre tract continued to be valuable to the landowner. With such record before it, this Court said:

" * * * there is no question but that the mineral estate, since appellee still owns the balance of the 61 acre tract, also has value to him. Calvert v. Harris County, Tex.Civ.App., 46 S.W.2d 375 (W.R.); Boothe v. McLean, Tex.Civ. App., 267 S.W.2d 158 (167) (reversed on another point, 154 Tex. 272, 276 S.W.2d 777), 156 A.L.R. 1416. The trial court should have, therefore, limited his definition of 'market value' of the land to the surface estate as appellant's objection indicated."

In the instant case, the jury found the oil and gas estate under the 280.64 acres, before taking, was worth $3,364.50, and after taking was valueless. The finding that the oil and gas estate under the 280.64 acres was valueless after the taking is not attacked by appellants. Jury findings in answer to Special Issues Nos. 4 and 5 have made valueless the oil and gas estate. (See Article 8280–188 V.A.C.S. for powers of Trinity River Authority.) The oil and gas estate under the 280.64 acres is not a remainder of the estate of the 280.64 acres directly being taken by the condemning Authority.

The condemning Authority has taken all of the sand, gravel, Fuller's earth, bentonite and such products, assuming such substances are found in the 280.64 acres. Oil, gas, and other fluid or gaseous minerals are not part of the remainder in this case, as they are not part of sand, gravel, Fuller's earth, bentonite, and such products. Point of Error No. 1 is overruled.

The burden was upon the condemnees to establish the extent of the damage or depreciation in value of the oil and gas estate underlying the 280.64 acres, which burden they met. Special Issues Nos. 1, 2 and 3, as phrased, were not objected to by the condemning Authority.

Here the condemning Authority, by no point of error denies that Lake Livingston will completely destroy the value of the oil and gas estate under the 280.64 acres. The Supreme Court of the United States, under analogous facts, held, in United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539, that the crucial question in such case was: Was there a taking of this land in the sense of the Constitution, within the meaning of the Fifth Amendment to the Constitution? Such Court held it was a taking because a property right of an owner of land was invaded by the Government.

Brazos River Authority v. City of Graham, 163 Tex. 167, 354 S.W.2d 99 (1961) was a case where the Brazos River Authority constructed a dam which caused the flooding from time to time of the sewerage disposal plant belonging to the City of Graham. The trial court considered that a "taking" of the plant had resulted because of its being subjected to repeated floodings caused by the operation and maintenance of Possum Kingdom Dam. The Supreme Court said:

"It therefore appears that we have a proceeding in the nature of an inverse condemnation in that the Authority has *taken* the property of the city and now the city is attempting to recover compensation for such taking." (Emphasis ours).

Upon Motion for Rehearing, it was contended that the evidence did not show a taking of the City's sewerage disposal plant. The opinion on Motion for Rehearing, beginning on page 130, held that it was a taking and it came under the rule of United States v. Lynah, supra, and concluded, "We adhere to our holdings expressed in the original opinion * * *."

In Article I, Section 17, Constitution of the State of Texas, there is a commentary in V.A.C.S. analyzing the holding in McCammon & Lange Lumber Co. v. Trinity & B. V. R. Co., 104 Tex. 8, 133 S.W. 247, 36 L.R.A.,N.S., 662 (1911), as follows:

" 'Taking' may be defined as a direct invasion of a right of property, of an appropriation of any interest in land by actual physical possession with the intention of permanently depriving the owner thereof, or of permanently encroaching upon, his property right."

See Kahn v. City of Houston, 121 Tex. 293, 48 S.W.2d 595, 599 (1932); City of Houston v. McFadden, 420 S.W.2d 811, 814 (Tex.Civ.App., 1967, ref. n. r. e.)

■ The use of the condemned 280.64 acres for a reservoir constitutes a new servitude of burden and a taking of the property of the fee owner of the dominant mineral estate with a right to the reasonable use of the surface as it existed before used for a reservoir, to develop, produce, care for, and transport oil, gas, and other minerals. See H. Rouw Co. v. Thompson, 194 S.W.2d 120, 122 (Tex.Civ.App., 1946, error ref.). This Lake Livingston Reservoir is not a passing thing. It is permanent in its nature. There is not simply a partial or incidental damage to the oil and gas estate, it is a taking resulting from a direct invasion of a right of property owned by appellees.

■ The deprivation of former owner rather than the accretion of a right or interest to the sovereign constitutes a "taking" for which just compensation must be paid. 11,000 Acres of Land, etc. v. United States, 152 F.2d 566, 568 (5th Cir. 1945), and cases cited.

In the Federal Courts, in an eminent domain case, the procedure is different from the Courts of this State, but the substantive principles on condemnation are the same.

Article I, Section 17, of the Constitution of Texas says, "no person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person * * *"; Amendment 5, U. S. Constitution, concludes with the words " * * * nor shall private property be taken for public use without just compensation."

Nichols on Eminent Domain, 3rd Edition, Vol. 2, page 407, defines "taking" as:

"The modern and prevailing view is that any substantial interference with private property which destroys or lessens its value, or by which the owner's right to its use or enjoyment is in any substantial degree abridged or destroyed, is, in fact and in law, a *'taking' in the constitutional sense, to the extent of the damages suffered, even though the title and possession of the owner remains undisturbed.* [Emphasis ours].

"In some of the early cases in this country, the courts adhering to the conception of property as the thing owned, construed the taking alluded to in state constitutions to be a 'taking altogether', an appropriation and dispossession of the owner which deprived him of the corpus of the property, and compensation was limited accordingly. The broader view, which now obtains generally, conceives property to be the interest of the owner in the thing owned, and the ownership to afford the owner *the rights of use, exclusion and disposition.* Under this broad construction there need not be a physical taking of the property or even dispossession; any substantial interference with the elemental rights growing out of ownership of private property is considered a taking."

In creating the Authority, the Legislature relied upon the provisions of Art. XVI, § 59 of the Texas Constitution (Art. 8280–188, § 1, V.A.C.S.) and specifically granted the power of eminent domain (Id., § 25). Thus, Trinity River Authority could have, had it chosen so to do under the facts of this case, condemned the entire fee simple estate in the 280.64 acre tract owned by the appellees. Brazos River Conservation and R. Dist. v. Costello, 135 Tex. 307, 143 S.W.2d 577, 130 A.L.R. 1220, (1940).

It did not choose to do this and we are not permitted to speculate as to the reason it carefully chose the words attempting to limit the taking. Instead of the entire fee simple estate, it defined its taking as follows:

"FEE TRACT: Fee simple title in and to this tract of land, [the 280.64 acre tract involved in this point], save and except therefrom all oil, gas and other fluids or gaseous minerals in, under and that may be produced from said land, together with the right of ingress or egress for the purpose of exploring, drilling, developing, and producing the same, *subject and subordinate,* however, to the right of the Plaintiff to construct, maintain and operate on and over said land, or adjacent thereto, a reservoir for impounding water." (Emphasis ours).

This exact language was carried over into the judgment awarding the land to the Authority.

By barring the owner of the oil and gas estate from the use of the surface as and for their dominant estate, the condemning Authority has completely destroyed the value of the oil and gas estate; these findings of the jury come before us unchallenged. The condemning authority attempted to avoid paying for the oil and gas estate even though under the record here it deprived the owners thereof of access thereto, and even now by no point of error has challenged the findings of the jury to Special Issues Nos. 4 and 5.

Art. 3265 (Subd. 3) V.A.C.S., relating to the measure of damages to be awarded the owner when only a part of a tract of land is condemned, requires that the owner be paid as compensation the value of the land actually taken. The appellee waived any question of damages to the remainder of his tract of land, the 70 acres. Art. 3265 (Subd. 3) V.A.C.S., reads as follows:

"When only a portion of a tract or parcel of a person's real estate is condemned, the commissioners shall estimate the injuries sustained and the benefits received thereby by the owner; whether the remaining portion is increased or diminished in value by reason of such

condemnation, and the extent of such increase or diminution and shall assess the damages accordingly."

Here there is a complete taking of the surface. The remainder owned by condemnees was the adjoining 70 acres of surface, more or less, not the oil and gas estate of the 280.64 acres. In State v. Meyer, 403 S.W.2d 366 (Tex.Sup.1966), the "State's argument that the newly abutting remainder would be increased in value was rejected by the Court on the basis that consideration of this factor would allow the enhanced value of the remainder to offset the value of the land actually taken, which violates the general rule of valuation used in Texas." Texas Law Review, Vol. 44, No. 8, Note 11, pages 1623 and 1624.

In overruling appellant's Point of Error No. 1, we consider the following applicable:

In the case of Brazos River Conservation and Reclamation District v. Adkisson, 173 S.W.2d 294 (Tex.Civ.App.1943, error ref.), the condemnor obtained condemnation of an easement in an oil and gas leasehold, the lease embracing approximately 487 acres, of which 413.22 acres were flooded by the reservoir. The trial court rendered judgment for the leaseholder for the value of the lease, and among other things, said on page 301:

"Under the authorities we do not believe that the rules of law applicable to the condemnation of an easement in a leasehold estate differ in principle from the rules applicable to the condemnation of a fee or interest owned by the lessor. As a practical matter it was in no respect feasible for Adkisson to drill in the water and produce oil. The use and value of his property was destroyed as in the case of United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 357, 47 L.Ed. 539, where the court, in disposing of a case where land was flooded by a dam, says:

"'It is clear from these authorities that where the government by the construction of a dam or other public works so floods lands belonging to an individual as to substantially destroy their value there is a taking within the scope of the 5th Amendment. While the government does not directly proceed to appropriate the title, yet it takes away the use and value; when that is done, it is of little consequence in whom the fee may be vested.'"

See Pickens v. Hidalgo County Water Control & Imp. Dist., 284 S.W.2d 784 (Tex.Civ.App.1955, no writ).

Appellant's Point No. 2 is:

"The trial court erred in admitting evidence of a sale where the price reflected considerable enhancement resulting from the Lake Livingston Project."

Maps show that the land condemned is located in the western part of Polk County, Texas, in an area comprising large tracts of land owned principally by timber companies. The record reflects the existence of only one sale in the vicinity of the condemned property used by the appraisers and expert witnesses for either appellant or appellees. Appellant strenuously attacks a sale from Arnold to Galloway. This sale was objected to by appellant because it was only 1,500 feet from the proposed lake. Appellant contended in the trial court that any land within two miles of the proposed Lake Livingston shoreline must conclusively be deemed greatly enhanced by such improvement, taking the position that land located within two miles from the shoreline should not be considered by expert appraisers for any purpose in connection with the valuation of property taken by condemnation.

The expert witnesses, Dinkins and Allen, testified that the Arnolds sold Galloway 57.56 acres fronting on a County dirt road that was to be a highway. It was smaller in size than the condemned tract of land. In the opinion of the witnesses, it was superior in value to the land being condemned. The witnesses stated that they could and had discounted such superiority to use it as a comparable tract to the

land being condemned. Arnold sold Galloway 57.56 acres at $713.00 per acre. By discounting such tract $263.00 per acre because of its highway frontage, the witnesses testified that it would be comparable in value to the subject property. such witnesses had made personal observation and examination of the land in question, the comparable tracts used by them, and testified they knew the value of the land condemned.

The values found by the jury in this case were within the range of the highest and lowest valuation figures testified to by the various witnesses. Cases holding the jury's determination of value are not limited to prices of one or more "comparables", or comparable sales admitted into evidence are too numerous to comment. See Vander Weg v. State, 413 S.W.2d 118 (Tex. Civ.App.1967, error ref. n. r. e.) and cases cited. The court, in its charge, specifically excluded from the jury's consideration any increase in market value, if any, resulting from the announcement of plans for and construction of Lake Livingston.

Appellees' witnesses testified, in their opinion, the surface of the subject property had a market value of $500.00 per acre (Allen) or $450.00 per acre (Dinkins), considering the property in its condition and situation today and excluding any increase in market value resulting from the announcement of plans for and construction of the proposed Livingston Dam and Reservoir. The growth of Houston in the last several years with the desire of its inhabitants to have a place in a rolling country with trees and streams, has caused a substantial increase in value of lands in the Livingston area. Very few sales of land in the immediate area of the condemned property are to be found.

Throughout the trial, the contention of appellees was that the land taken had a higher value and best use as property adaptable for rural small lake subdivision purposes. On that basis, appellees' witnesses arrived at the value of the condemned properties. The contention of appellant was that the highest and best use of such land was for agricultural or grazing purposes. The comparable sales, cited by expert witnesses for both sides, were taken from other areas of Polk County, 5½ miles to 35 miles from the subject property, with the exception of the Arnold to Galloway sale. Appellees' expert witnesses used many sales, including the sale of the nearby 57.56 acre tract conveyed by Arnold to Galloway. Appellant's witness, Houston, was looking for tracts suitable for agricultural or grazing purposes. By looking at the 280.64 acres, he would know there were several small lakes and a water course on the subject property. It was not swamp land as shown by its elevation, topographical maps and evidence from witnesses. While testifying, appellant's witness, Wiley Houston, cited comparable sales of properties located from 5½ to 35 miles away, somewhere near Livingston, Conroe, Votaw, and Onalaska. In every tract used as a comparable sale by Houston, he took into consideration the difference in topography, timber, accessibility, highway frontage, and so forth, to demonstrate to the jury the difference in value of each tract compared to the land being condemned. For instance, he testified that a 40 acre tract west of Livingston sold for $190.00 per acre because it was not entitled to access other than through property privately owned. Other comparable tracts that Houston used had sales values up to $350.00 an acre. Only using comparable tracts adapted to agricultural and grazing purposes, Houston stated the fair market value of the 280.64 acres of surface the Authority was acquiring from the Chain family was $56,128.00 or $200.00 per acre. On the 5.27 acre flowage tract, he placed a value of $200.00 per acre, with no decrease in value after the taking. On the contrary, he contended the flowage easement would be enhanced in value after the taking. In his opinion, the market value of the 280.64 acres, plus the 5.27 acres, was $56,655.00. Clearly, the jury did not believe the land being condemned had

its highest and best use for agricultural or grazing purposes. Just as clearly, the jury believed the highest and best use of the condemned property was its adaptability for rural small lake subdivision purposes. Appellees' witnesses testified that the Arnold to Galloway sale was of land that had a potential as commercial property some 50 to 75 years in the future, but denied that it was enhanced in value by the plans for or construction of Lake Livingston.

■ On the day the trial began, the plaintiff, Authority, filed its Motion to Suppress Evidence. Such Motion limited the witnesses from revealing the sales price paid for any and all tracts of land lying adjacent to, bisected by, or lying within two miles of the normal line of the Livingston Reservoir. This Motion in Limine was sustained by the trial court, initially. The plaintiff below, appellant here, took the position that land located within such arbitrary distance of two miles of the shoreline of Lake Livingston was conclusively greatly enhanced by such improvement; that such location alone is sufficient to establish that such sales should not be considered by such expert appraisers for any purpose in connection with the values of property taken in fee or for flowage easement purposes by condemnation. During the trial, the judge, in his sound discretion, reversed his ruling on this Motion in Limine, considering all the evidence then before him. There was no abuse of discretion on the part of the trial court.

Appellant contends there is no evidence of probative value to support the jury finding to Special Issues Nos. 1 and 2. Considering only the evidence favorable to the jury findings, such Points of Error are overruled.

■ Appellant contends there is insufficient evidence to support the jury finding to Special Issue No. 1 and Special Issue No. 2. Considering the entire record, these Points of Error are overruled. Appellees' witnesses, J. W. Dinkins and Duncan Allen, were expert witnesses testifying at length as to their appraisal technique in arriving at the values placed by them on these properties. They used the market data approach, searching the area for sales considered comparable. Finally, using many comparables and not limiting themselves to any particular sale, they gave their opinion of the market value of the property condemned. The jury findings do not exceed the values placed thereon. Houston, the witness for appellant, did not know and ignored the fact that the appellees had a private easement to the property in question. Appellees' witnesses disregarded any enhancement in value of the subject property because of the taking or improvement by the Authority. These insufficient evidence points of error are overruled. Natural Gas Pipeline Company of America v. Towler, 396 S.W.2d 917, 921 (Tex.Civ.App.1965, no writ).

Appellant contends the verdict is grossly excessive. Finally, the appellant contends the accumulative effect of the errors covered by other points of error, together with the manner in which the trial was conducted, amounted to a denial of appellant's right to a fair trial and probably caused the rendition of an improper judgment of the trial court. Nothing new is urged in these points of error. They are overruled. Texas Pipe Line Co. v. Hunt, 149 Tex. 33, 228 S.W.2d 151, 156 (1950).

Judgment of the trial court is affirmed with the $527.00 remittitur on the part of the appellees.