**TARRANT COUNTY WATER CONTROL AND IMPROVEMENT DISTRICT NUMBER ONE, Petitioner,**

v.

**P.D. FULLWOOD, individually and d/b/a P.D. Fullwood Operating Company, La Pesca Productions, Inc. and Haupt, Inc., Respondents.**

No. 96–0541.

Supreme Court of Texas.

Feb. 13, 1998.

Rehearing Overruled April 14, 1998.

Stan Harrell, Fort Worth, Shannon H. Ratliff, Marc O. Knisely, Karen L. Watkins, Austin, for Petitioners.

Philip E. McCleery, Peter K. Rusek, Waco, for Respondents.

HECHT, Justice, dissenting from the denial of application for writ of error.

The Court's denial of the application for writ of error in this case means that taxpayers in Fort Worth and nearby cities must pay over $2,000,000 for their water that they do not owe. The public interest involved in this case deserves full review. I respectfully dissent from the denial of application for writ of error.

The principal issue raised here is whether the Tarrant County Water Control and Improvement District Number One is liable for inverse condemnation of a mineral interest. The circumstances are these.

To construct the Richland–Chambers Reservoir, which now provides fresh water for Fort Worth and nearby cities, the Tarrant County Water Control and Improvement District Number One acquired some 45,000 acres, including a 316.3–acre tract owned by P.D. Fullwood and his wife. Fullwood and his wife conveyed only the surface to the District. The deed included the following provisions:

The purpose of this conveyance and purchase is to enable the Grantee to construct, own, control, maintain and operate on and over said property a reservoir designed to effect the storage of water as an additional supply of drinking water for the City of Fort Worth and Tarrant County, Texas. This reservoir is to be created by means of the construction of a dam with all appurtenant works.

This conveyance is made to consummate a negotiated sale of the land hereinafter described, in lieu of condemnation proceedings. The consideration paid to Grantor includes and covers all damages and claims which Grantor might have asserted in condemnation proceedings, including but not limited to that caused to Grantor's adjacent property by the impounding and storage of water in said reservoir.

* * *

The Grantor herein reserves unto themselves, their heirs, successors and assigns, all oil, gas and other fluid or gaseous minerals in and under the land herein described, together with the right of ingress and egress for the purpose of exploring for, and producing the same therefrom, subject and subordinate, however, to the right of Grantee to construct, maintain and operate a reservoir for impounding fresh water. Grantor, their heirs, successors and assigns, shall prevent contamination of said reservoir during or resulting from the use and development of the said reserved mineral estate.

At the time, the minerals were leased. Fullwood and his two sisters each owned one-third of a one-eighth royalty, and Fullwood owned the possibility of reverter in the entire mineral interest. Ten wells had been drilled on the tract, four of which were still producing. The District condemned the leasehold interests and proceeded to plug the wells and to remove all equipment, pipelines, and electric lines and poles. (Over the entire lake bed area, the District plugged about 800 wells and removed related materials.) The District also offered to purchase the royalty interests. Fullwood's sisters accepted, but

Fullwood himself declined. When production ceased, the mineral interest reverted to Fullwood, who then re-entered one well, elevated the wellhead on a platform above the eventual lake surface, and restored production. Fullwood did not attempt to re-enter any of the other wells before inundation. After inundation, Fullwood contributed part of his acreage to a unit in which four directional wells were later completed, two of which are producing.

Claiming that the District had thwarted further efforts to restore production of his minerals, Fullwood sued the District for inverse condemnation of his mineral estate. The district court granted partial summary judgment for the District, holding that it had not taken any property of Fullwood's except his royalty interest. After a jury trial, the court awarded Fullwood $60,000 for what the jury found to be the value of his royalty interest at the time the District plugged the wells, based on the anticipated future economic productive life of the oil reserves. Fullwood appealed only from the partial summary judgment; the District did not appeal. Thus the $60,000 award became final. The court of appeals reversed the partial summary judgment and remanded, explaining:

> Although Fullwood's right to produce the minerals was made subordinate to the Water District's right "to construct, maintain and operate a reservoir," the clause does not evidence an intent to convey the entire mineral estate to the Water District. Indeed, the subordination clause itself contains a covenant by Fullwood to prevent the contamination of the Reservoir from the use and development of his reserved mineral estate. Even though the rights of the dominant estate were made subordinate to the rights of the servient estate, the owner of each estate must exercise his rights with due regard for the rights of the other. As a result, any interference by the Water District with Fullwood's limited right to produce the minerals, beyond that reasonably necessary to inundate the Reservoir, constituted a taking by inverse condemnation. Because the summary judgment evidence suggests that the Water District did not reasonably accommodate

Fullwood's development of the minerals, particularly in light of prior representations that it would do so, and that the Water District's actions restricted even Fullwood's limited access to the mineral estate, we ... reverse the judgment and remand the cause for trial.

A copy of the court of appeals' unpublished opinion is attached.

On remand, after a bench trial, the district court concluded that "[b]ased on the Court of Appeals opinion in this cause, and based on other facts in this cause, at least a large part of the mineral interest was damaged by inverse condemnation." The court's only finding supporting this conclusion was the following:

> Based on the inundation of the surface for the reservoir, the cost of attempted re-entry, if possible, would be very costly. The other alternative means of directional drilling would also be very costly.

The issue of damages was then tried to a jury, who found the damages to Fullwood's mineral estate to be $1,947,065. The district court rendered judgment for Fullwood for that amount plus the $60,000 previously awarded and not appealed. The court of appeals reduced Fullwood's damage award by $18,000 received in settlement with a third party and affirmed. A copy of the court of appeals' second opinion is also attached.

The District argues that because Fullwood agreed in the deed that his mineral estate would be subordinate to the District's surface estate, it had no duty not to interfere with his development and production of the minerals. I disagree. Ordinarily, "a mineral estate together with the common law right to use the surface estate is the dominant estate." *Chambers–Liberty Counties Navigation Dist. v. Banta*, 453 S.W.2d 134, 137 (Tex.1970). But Fullwood and the District modified this rule by agreement expressed in their deed. However, the deed provides that Fullwood's mineral interest will be "subject and subordinate" only "to the right of Grantee to construct, maintain and operate a reservoir for impounding fresh water", not to other rights the District might assert. The deed also obligated Fullwood to "prevent contamination of said reservoir during or re-

sulting from the use and development of the said reserved mineral estate", but it did not preclude him from all production of his minerals. The District had no right to interfere with Fullwood more than was reasonably necessary to construct, maintain, and operate the reservoir, and if it did so, it damaged Fullwood's property. If that damage is compensable under Article I, Section 17 of the Texas Constitution, then Fullwood would be entitled to judgment against the District for inverse condemnation.

The District argues that there is no evidence that it interfered with Fullwood's production of his minerals more than was necessary to operate the reservoir. Here, I agree with the District. Fullwood argues that the District unnecessarily interfered with his mineral production by unlawfully embedding steel in the plug in the well Fullwood re-entered, wrongfully attempting to enjoin the re-entry operation, filing groundless complaints with the Railroad Commission, requesting the electric utility to discontinue service, and removing the pipelines it acquired by condemnation of the working interest. The District did improperly plug one well, but there is no evidence from which the jury could compute the damages the plug caused in either increased costs of re-completing the well or any loss of production. The District's claims in court and commission proceedings were not an unreasonable interference with Fullwood's rights but an effort to exercise its own rights, even if it did not ultimately prevail. Requesting discontinuance of existing electric service was necessary to protect users of the reservoir from electrocution and did not prevent Fullwood from arranging for other service. And the District was entitled to remove the pipelines and other materials it acquired by condemnation of the working interest.

Fullwood also argues that the District was obliged to accommodate him, such as by building levees to accommodate mineral production, but this is incorrect. Fullwood's deed to the District clearly expresses that the mineral estate is to be subordinate to the District's operation of the reservoir. As long as the District's activities were reasonably necessary toward that end, it was not required to facilitate Fullwood's efforts. Unquestionably, inundation of the surface has made mineral production more difficult and costly, but that was contemplated in the deed. The District has not prevented Fullwood from producing his minerals.

Whether there has been inverse condemnation is a question of law for the court, although consideration of the facts is, of course, part of the determination. *City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 804 (Tex.1984). In this case, the dispute is over the significance of the evidence rather than the evidence itself. There is nothing in the evidence to show that the District reasonably interfered with Fullwood's exercise of his rights as to amount to inverse condemnation.

I would grant the District's application for writ of error, reverse the judgment of the court of appeals, and render judgment for Fullwood for only $60,000 plus interest. The parties to this case are well represented by excellent counsel. The issues have been thoroughly briefed—the three briefs filed total 138 pages. The case affects not only Fullwood and the District but thousands of taxpayers who reside in the District. There is, as I have shown, error in the lower courts' decisions which ought to be corrected. In short, there are compelling reasons for the Court to grant review and none to refuse it.

Hence, I respectfully dissent.

### ATTACHMENT 1

### IN THE TENTH COURT OF APPEALS

P. D. Fullwood, Individually and d/b/a P.D. Fullwood Operating Company, et al.,
Appellants

v.

Tarrant County Water Control and Improvement District Number One and Pool Company, Appellees

No. 10–92–020–CV

From the 13th District Court Navarro County, Texas Trial Court # 103–89

Filed March 2, 1993

*OPINION*

CUMMINGS, Justice.

On June 29, 1981, P.D. Fullwood executed a warranty deed conveying the surface estate

on a 316.3–acre tract of land in Navarro County to the Tarrant County Water Control and Improvement District Number One. The surface estate was acquired by the Water District for its use in the construction of the Richland–Chambers Reservoir. The lessees under a 1943 mineral lease continued production of oil and gas from the severed mineral estate until September 1986, when the Water District acquired by condemnation the leasehold interest of Exxon Corporation and Olsan Brothers, Inc. The Water District held and operated the leasehold interest until it completed plugging and abandoning the wells in April 1987. As a result, the leasehold interest terminated and the mineral estate reverted to Fullwood.

To protect his interest in the mineral estate, Fullwood leased the minerals under the 316 acres to La Pesca Productions, Inc. on July 29, 1988. La Pesca then entered into a Joint Development Agreement with Haupt, Inc. on August 1, 1988. Fullwood, La Pesca, and Haupt allege, however, that they were deprived of reasonable access to the mineral estate because Pool Company, contracted by the Water District to plug the wells, wrongfully left non-drillable material in one or more of the well bores. Furthermore, according to Fullwood, the Water District wrongfully obtained a temporary restraining order against the re-entry operation, attempted to obtain temporary injunctions against re-entry and against construction of a pipeline, and repeatedly filed groundless complaints with the Railroad Commission of Texas. As a result, the mineral interest owners were unable to completely implement their plan to reestablish production before the land was inundated by the waters of the Reservoir in the Spring of 1989. Fullwood, La Pesca, and Haupt filed suit to recover damages for the actions of the Water District and Pool Company in operating, plugging, and abandoning the wells.

## Breach of Express or Implied Covenants

Fullwood alleged that the Water District, as the operator of the leasehold estate from September 1986 to April 1987, breached express or implied covenants by failing to properly develop and produce the minerals. The trial court granted the Water District's first motion for summary judgment, determining as a matter of law that the Water District was not liable for any alleged breach of express or implied covenants. In point six, Fullwood, La Pesca, and Haupt contend that the court erred in granting the Water District's first motion for summary judgment.

The Water District acknowledges that the lessee under an oil and gas lease owes three basic implied covenants to the reasonably prudent operator: (1) to develop the premises; (2) to protect the leasehold; and (3) to manage and administer the lease.[1] Nevertheless, the Water District argues, without any supporting authority, that it should not be held to the reasonably prudent operator standard because "doing so would defeat the purpose for which the working interests were acquired." We disagree.

The summary judgment record indicates that the working interests were acquired, not only to facilitate the construction of a reservoir, but in an attempt to avoid the necessity for condemnation of the entire mineral estate. The minutes of the Board of Directors of the Water District, dated March 5, 1986, indicate that the Water District was aware of the problems associated with purchasing only the working interest. Nevertheless, the Water District chose to condemn only the leasehold estate and assumed the role of operator from September 1986 to April 1987. Any drainage from the field resulting from the breach of express or implied covenants would have diminished the value of the mineral estate remaining when the lease was abandoned by the Water District. Because a taking would not occur until the Water District subsequently interfered with the right of access to the mineral estate,[2] Fullwood would be unable to recover, in an inverse

1. *See Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 567 (Tex.1981).

2. *See Haupt, Inc. v. Tarrant County Water Control and Improvement District Number One*, 833 S.W.2d 697, 698 (Tex.App.-Waco 1992, writ requested).

condemnation proceeding, for such a diminution occurring before the mineral estate reverted to him. As a result, Fullwood would be damaged without recourse unless the Water District was held to the reasonably prudent operator standard of care. Therefore, we hold that the Water District's argument is without merit and sustain point of error six.

### The "Borrowed–Servant" Doctrine

Pool Company filed a motion for summary judgment, arguing that, because Pool's personnel were the "borrowed servants" of the Water District, Pool was not liable for any negligence or other wrongdoing associated with the presence of non-drillable material in a plugged well or the filing of false reports with the Railroad Commission. The court granted Pool's motion for summary judgment in its entirety. In points seven and eight, Fullwood, La Pesca, and Haupt contend that the court erred in granting Pool's motion for summary judgment because the summary judgment evidence created a fact issue as to whether Pool's employees were the borrowed servants of the Water District.

In connection with the plugging activities, the Water District entered into an Equipment Lease with Pool. Under the terms of that agreement Pool leased equipment, provided personnel, and agreed to the performance of certain work. The lease provided that the Water District "shall furnish all supervisory personnel for the project as contemplated by this lease agreement, which personnel shall have *sole and complete authority for the direction and supervision of all work to be performed.*" (Emphasis added).

Fullwood argues, however, that Pool retained actual control of the manner, method, and detail of the plugging operations and the completion of the reports filed with the Railroad Commission. In response to Pool's motion for summary judgment, Fullwood offered the following excerpt from the deposition of Woody Frossard, the Environmental Manager of the Water District:

The technical supervision, actually from that standpoint, if I'm understanding your question—We had written specs of how to plug the well that had been approved by the Railroad Commission. That was our Technical Specs that we used to do it. Mr. Ray [the Water District's field supervisor] was in charge of seeing that the wells were done according to those guidelines. *I don't want to say that he was out there making the decisions on how to plug a well, if that's what you're getting at. He was our field supervisor from that standpoint.*

(Emphasis added). Frossard also testified that Pool's toolpushers occasionally supervised the plugging of wells. The testimony of Danny Slate, Pool's crew chief in charge of the well in which the non-drillable material was found, was also offered on the issue of supervision and control. Slate confirmed that he received instructions from both the Water District and Pool's toolpushers.

A contract between two employers providing that one shall have the right of control over certain employees is a factor to be considered, but it is not controlling.[3] The Texas Supreme Court has held that a contract will not prevent the existence of a master-servant relationship when the contract is "a mere sham or cloak designed to conceal the true legal relationship between the parties."[4] According to the Supreme Court, when "the right of control prescribed or retained over an employee is a controverted issue, it is a proper function for the factfinder to consider what the contract contemplated or whether it was even enforced."[5] Because the summary judgment record contains evidence of Pool's control over the employees, the court erred in granting Pool's motion for summary judgment. As a result, we sustain points of error seven and eight.

### Restriction of Access and Reasonable Accommodation

The Water District filed its second motion for summary judgment arguing that, as a

---

3. *Exxon Corp. v. Perez,* 35 Tex. Sup.Ct. J. 778, 778 (May 27, 1992).

4. *See id.*

5. *Id.*

matter of law, no taking resulted from inundation of the Reservoir because the 1981 deed expressly subordinated the mineral estate's right of access to the Water District's right to impound water upon the surface. The trial court granted the Water District's second motion for summary judgment, except with regard to Fullwood's royalty interest. After a jury trial on the value of Fullwood's royalty interest, the court awarded Fullwood $60,000 and entered a final judgment in favor of the Water District and Pool Company on all other theories of recovery. In points one through five, Fullwood, La Pesca, and Haupt contend that the court erred in granting the Water District's second motion for summary judgment. They argue that the summary judgment evidence raised fact issues as to the meaning of the subordination clause and as to whether the manner in which the Water District constructed the Reservoir and inundated the surface resulted in a restriction of access to the mineral estate or failed to reasonably accommodate the rights of the mineral interest owners.

The deed contained the following provision to reserve the mineral interest in Fullwood:

> The Grantor herein reserves unto themselves, their heirs, successors and assigns, all oil, gas and other fluid or gaseous minerals in and under the land herein described, together with the right of ingress and egress for the purpose of exploring for, and producing the same therefrom, *subject and subordinate, however, to the right of Grantee to construct, maintain and operate a reservoir for impounding fresh water.* Grantor, their heirs, successors and assigns, shall prevent contamination of said reservoir during or resulting from the use and development of the said reserved mineral estate.

(Emphasis added). A reservation of the mineral estate gives the grantor the dominant estate including the right to use as much of the premises and in such a manner, absent an express limitation, as is reasonably necessary to extract the minerals.[6] We hold that the subordination clause contained in the 1981 deed was such an express limitation of the dominant estate. A similar subordination clause in a condemnation petition and judgment was interpreted by the court in *Trinity River Authority v. Chain* as "completely destroy[ing] the value of the oil and gas estate."[7] The issues of restriction of access and reasonable accommodation, however, were not before the court in *Chain.*

In this case, Fullwood alleged that the Water District promised and represented that it would compensate the mineral owners for wells to be capped and that it would pay the initial cost of raising or protecting those wells to remain in production. Unlike the court in *Chain,* we do not find that the subordination clause "completely destroyed the value of the oil and gas estate."[8] In fact, the summary judgment evidence suggests that the parties to the 1981 deed contemplated continued production after the Reservoir was inundated. In *Getty Oil Company v. Jones,*[9] the Supreme Court was faced with seemingly irreconcilable positions; the surface owner was unable to operate his automatic irrigation sprinkler system because of obstacles in the form of the lessee's existing pumping units. Likewise, Fullwood is unable to produce oil and gas under its reservation of the mineral estate because of the manner in which the Water District constructed the Reservoir and inundated the surface.

Although Fullwood's right to produce the minerals was made subordinate to the Water District's right "to construct, maintain and operate a reservoir," the clause does not evidence an intent to convey the entire mineral estate to the Water District. Indeed, the subordination clause itself contains a covenant by Fullwood to prevent the contamination of the Reservoir from the use and development of his reserved mineral estate. Even though the rights of the dominant estate

---

6. *Ball v. Dillard,* 602 S.W.2d 521, 523 (Tex. 1980).

7. 437 S.W.2d 887, 892 (Tex.Civ.App.—Beaumont 1969, writ ref'd n.r.e.).

8. *See id.*

9. 470 S.W.2d 618 (Tex.1971).

were made subordinate to the rights of the servient estate, the owner of each estate must exercise his rights with due regard for the rights of the other.[10] As a result, any interference by the Water District with Fullwood's limited right to produce the minerals, beyond that reasonably necessary to inundate the Reservoir, constituted a taking by inverse condemnation.[11] Because the summary judgment evidence suggests that the Water District did not reasonably accommodate Fullwood's development of the minerals, particularly in light of prior representations that it would do so, and that the Water District's actions restricted even Fullwood's limited access to the mineral estate, we sustain points of error one through five.

We reverse the judgment and remand the cause for trial.

Before Justice Cummings, and Justice Vance (Chief Justice Thomas not participating)

Reversed and remanded

Opinion delivered and filed November 18, 1992

Do not publish

## ATTACHMENT 2
## IN THE TENTH COURT OF APPEALS

Tarrant County Water Control and
Improvement District Number
One, Appellant

v.

P.D. Fullwood, Individually and d/b/a P.D.
Fullwood Operating Company, et al.,
Appellees

No. 10–95–053–CV·

From the 13th District Court Navarro
County, Texas Trial Court
# 103–89

Filed June 12, 1996

### OPINION

PER CURIAM.

This is the second appeal to come before us involving this dispute. In the first, we held that the court had erred in granting the

Tarrant County Water Control and Improvement District Number One (the District) a take-nothing summary judgment on P.D. Fullwood, et al.'s (Fullwood) claim that the District had inversely condemned the mineral estate underlying a portion of the Richland–Chambers Reservoir in Navarro County and remanded the cause for trial. *P.D. Fullwood v. Tarrant County Water Control and Improvement District Number One,* No. 10–92–020–CV, 963 S.W.2d at 62 (Tex.App.-Waco, November 18, 1992, writ denied) (not designated for publication) (*Fullwood I*). On remand, the trial court ruled, after a bench trial, that the District had inversely condemned Fullwood's mineral estate. Damages were tried to a jury, which determined that the damages to the estate were $1,947,065. The court added $60,000, the amount of a judgment awarded to Fullwood before the first appeal as damages for condemnation of his royalty interest in a lease covering the same property, and rendered a final judgment in the amount of $2,007,065.

The District appeals from this judgment, raising eleven points of error. Its first six points argue that the court erred in finding that it had inversely condemned the minerals. We will reject these contentions primarily because they are based on a misreading of *Fullwood I.* The five remaining points attack the court's failure to award the District title to the minerals, the amount of the judgment, and various evidentiary rulings by the court. We will affirm the judgment to the extent it is consistent with the court's factual finding that the estate was damaged, but we will sustain one of the District's complaints under the "one satisfaction" rule and reform the judgment to delete the double recovery. Fullwood raises one cross-point, complaining that the court conducted a bench trial on the inverse condemnation issue, which we will not reach.

### BACKGROUND

LAND, WATER AND OIL

The mineral estate at issue lies under two tracts of land, totaling 316.3 acres, and is

---

**10.** *See Warren Petroleum Corp. v. Martin,* 153 Tex. 465, 271 S.W.2d 410, 413 (1954).

**11.** *See Chambers–Liberty Counties Navigation Dist. v. Banta,* 453 S.W.2d 134, 137 (Tex.1970).

part of the South Kerens (Woodbine) Field. Fullwood acquired the surface of the 316.3 acres from his parents in August 1954. At that time, the mineral estate was subject to a 1943 mineral lease executed by his parents. Fullwood inherited the reversionary interest under the lease upon his mother's death in 1970. At the same time, she devised him a one-third interest in the one-eighth royalty under the 1943 lease.

In 1979, the District began acquiring the surface estate of some 45,000 acres of land for the construction of the Richland–Chambers reservoir, a fresh-water reservoir servicing Fort Worth, Corsicana, and the surrounding area. Fullwood conveyed the surface of the 316.3 acres to the District in 1981 as the result of a negotiated sale in lieu of condemnation. The deed expressly recognized the purpose of the acquisition and reserved the minerals to Fullwood, subject to the District's right to construct, maintain, and operate the reservoir.

At the time of the sale of the surface to the District, Exxon Corporation and Olson Brothers, Inc., the successors-in-interest of the lessees under the 1943 lease, maintained ten oil wells on the land, four of which were in production. Initially, the District indicated that it did not intend to condemn the working interests of these lessees. However, through condemnation in 1986, the District acquired Exxon's and Olson Brothers' leasehold interests. Although the District continued to operate the condemned working interest through its agent Pool Company and to pay the royalties due under the 1943 lease during the fall of 1986, by April 1987 it had plugged all of the wells on the 316.3 acres.

The District continued to prepare the lakebed for inundation. It cleaned up all of the well sites located within the bed area, removed or buried pipelines, and removed electrical wires and poles. In July 1987 the dam was closed and inundation began.

Because the 1943 mineral lease terminated sixty days after production stopped, Fullwood acquired ownership of the full mineral estate in May or June 1987. He began to make plans for the production of the miner-als. In May 1988 he applied for and was granted permits by the Railroad Commission to re-enter four wells located on the property. In July, he began reentry operations on a well referred to as the Fullwood 1–X well. On July 29, 1989, he executed a new mineral lease with La Pesca Production, Inc. covering the full 316.3 acres. Within days La Pesca entered into a joint development agreement with Haupt, Inc., assigning Haupt one-half of the lease interest. During the reentry operations on the 1–X well, Fullwood encountered "junk," i.e., non-drillable material such as steel or iron, in the well bore. This material delayed completion of the well and increased his operating expenses. After completing the reentry operations on this well, Fullwood obtained permission from the Railroad Commission to create a 20–acre unit to support the 1–X well's production. In anticipation of inundation for the Reservoir, Fullwood elevated the 1–X wellhead on a platform which would be above the water level.

In early May 1989, the Reservoir reached its normal pool elevation, and all of the well sites on the 316.3 acres were covered by water.

THE LAWSUIT AND THE FIRST APPEAL

Fullwood, La Pesca and Haupt filed suit against the District in March 1989, alleging, among other things, that the District had inversely condemned the mineral estate underlying the 316.3 acres, and violated its duty as the lessee under the 1943 lease to act as a reasonably prudent operator during the period it held the working interest. Fullwood also sued Pool, the company hired by the District to operate, plug, and clean up the well sites in the lake bed area, alleging that it had placed the junk in the 1–X well bore and had joined the District in resisting his attempts to obtain permits for his reentry operations. Fullwood requested that the court reform or rescind the 1981 deed's provisions regarding the mineral estate so that the deed would not hamper his right to produce the minerals. Finally, he sought damages in an amount not to exceed $10 million.

The District successfully sought to dispose of the majority of Fullwood's claims by summary judgment. In one partial summary judgment, the court ruled that the District

was not held to the reasonably prudent operator standard of conduct in relation to the working interest under the condemned lease. In a second partial summary judgment, the court ruled that the District had not condemned Fullwood's mineral estate because the 1981 deed subordinated the mineral estate's right of access to the District's right to impound water. However, the court reserved out of this second summary judgment Fullwood's claims concerning his royalty interest under the 1943 lease. Apparently, the court later ruled that the District had condemned Fullwood's royalty interest, and the issue of damages was tried to a jury. After the jury returned a verdict valuing Fullwood's royalty interest over the life of the lease at $60,000, the court rendered a final judgment in December 1991 incorporating its rulings on the earlier partial summary judgments and awarding Fullwood the damages found by the jury. This judgment also made final a take-nothing interlocutory summary judgment that had been granted to Pool.

Fullwood appealed the judgment, complaining about the court's legal rulings. On November 18, 1992, we reversed the judgment. First, we concluded that the District should be held to the reasonably prudent operator standard during the period before it abandoned the lease. In sustaining Fullwood's attacks on the judgment as they related to inverse condemnation, under a section heading "Restriction of Access and Reasonable Accommodation," we stated:

The deed contained the following provision to reserve the mineral interest in Fullwood:

The Grantor herein reserves unto themselves, their heirs, successors and assigns, all oil, gas and other fluid or gaseous minerals in and under the land herein described, together with the right of ingress and egress for the purpose of exploring for, and producing the same therefrom, *subject and subordinate, however, to the right of Grantee to construct, maintain and operate a reservoir for impounding fresh water.* Grantor, their heirs, successors and assigns, shall prevent contamination of said reservoir

during or resulting from the use and development of the said reserved mineral estate.

(Emphasis added). A reservation of the mineral estate gives the grantor the dominant estate including the right to use as much of the premises and in such a manner, absent an express limitation, as is reasonably necessary to extract the minerals. [*Ball v. Dillard,* 602 S.W.2d 521, 523 (Tex.1980).] We hold that the subordination clause contained in the 1981 deed was such an express limitation of the dominant estate. A similar subordination clause in a condemnation petition and judgment was interpreted by the court in *Trinity River Authority v. Chain* as "completely destroy[ing] the value of the oil and gas estate." [437 S.W.2d 887, 892 (Tex.Civ. App.-Beaumont 1969, writ ref'd n.r.e.).] The issues of restriction of access and reasonable accommodation, however, were not before the court in *Chain.*

In this case, Fullwood alleged that the Water District promised and represented that it would compensate the mineral owners for wells to be capped and that it would pay the initial cost of raising or protecting those wells to remain in production. Unlike the court in *Chain,* we do not find that the subordination clause "completely destroyed the value of the oil and gas estate." [*See id.*] In fact, the summary judgment evidence suggests that the parties to the 1981 deed contemplated continued production after the Reservoir was inundated. In *Getty Oil Company v. Jones,* [470 S.W.2d 618 (Tex.1971)] the Supreme Court was faced with seemingly irreconcilable positions; the surface owner was unable to operate his automatic irrigation sprinkler system because of obstacles in the form of the lessee's existing pumping units. Likewise, Fullwood is unable to produce oil and gas under its reservation of the mineral estate because of the manner in which the Water District constructed the Reservoir and inundated the surface.

Although Fullwood's right to produce the minerals was made subordinate to the Water District's right "to construct, maintain and operate a reservoir," the clause does not evidence an intent to convey the

entire mineral estate to the Water District. Indeed, the subordination clause itself contains a covenant by Fullwood to prevent the contamination of the Reservoir from the use and development of his reserved mineral estate. Even though the rights of the dominant estate were made subordinate to the rights of the servient estate, the owner of each estate must exercise his rights with due regard for the rights of the other. [*See Warren Petroleum Corp. v. Martin*, 153 Tex. 465, 271 S.W.2d 410, 413 (1954).] As a result, any interference by the Water District with Fullwood's limited right to produce the minerals, beyond that reasonably necessary to inundate the Reservoir, constituted a taking by inverse condemnation. [*See Chambers–Liberty Counties Navigation Dist. v. Banta*, 453 S.W.2d 134, 137 (Tex., 1970).] Because the summary judgment evidence suggests that the Water District did not reasonably accommodate Fullwood's development of the minerals, particularly in light of prior representations that it would do so, and that the Water District's actions restricted even Fullwood's limited access to the mineral estate, we sustain points of error one through five.

*Fullwood*, No. 10–92–020–CV, slip op. at 6–8, 963 S.W.2d at 65–66 (citations in text substituted for footnotes). Because we sustained Fullwood's complaints relating to both partial summary judgments, we reversed the court's final judgment and remanded the cause for trial. We also sustained his attacks on the judgment rendered in favor of Pool and remanded those claims as well.

### DEVELOPMENTS DURING THE PENDENCY OF THE LAWSUIT AND THE FIRST APPEAL

In early 1992, Samedan Oil Company obtained a permit from the Railroad Commission for a secondary recovery project for the entire South Kerens Field. Fullwood joined other affected landowners in executing a unitization agreement with Samedan. He contributed all of his productive acreage, except the 20–acre 1–X unit, to Samedan's 976–acre unit in exchange for royalty and overriding royalty interests in the Samedan Unit proceeds. Using directional drilling, Samedan

drilled three producing wells and one dry hole. The dry hole well was bottomed under Fullwood's 316.3 acres.

### PROCEEDINGS ON REMAND

On remand, Fullwood amended his petition to include an allegation, as an issue of fact, that the District had caused him harm by "refusing to accommodate an existing use of [his] property when reasonable accommodation was possible." In reply, the District asserted that it did not have any duty to accommodate Fullwood's limited right to produce the minerals. Fullwood took the position that he was entitled to a jury trial on all issues under the holdings in *Fullwood I*. Although he conceded that inverse condemnation is ordinarily a matter of law for the court to decide, he argued that the reasonableness of the District's activity was for a jury, under both *Fullwood I* and other case law. *Id.; City of San Antonio v. Guidry*, 801 S.W.2d 142, 145 (Tex.App.-San Antonio 1990, no writ). The District urged the court to apply the general procedure and to conduct a bench trial on Fullwood's inverse condemnation claims, citing, among other authorities, our opinion in *Haupt v. Tarrant Cty. Water Control*, 833 S.W.2d 697, 698 (Tex.App.—Waco 1992), *rev'd on other grounds*, 854 S.W.2d 909 (Tex.1993). After considering *Guidry* and *Haupt*, the court decided to conduct a bench trial on Fullwood's inverse condemnation claim.

During the three day bench trial in September 1994, Fullwood presented testimony indicating the District had made representations to him prior to the sale of the surface that it would construct the reservoir in such a way as to accommodate his mineral production operations. He also attempted to show that the District was responsible for the "junk" in the wells, had destroyed the roads and electrical-supply network leading into the reservoir area, had resisted his attempts to obtain the necessary production permits from the Railroad Commission, and had filed two injunctions suits against him to prevent him from proceeding with various steps of his reentry plans. In examining Gus Frossard, a District employee who worked on the "oil and gas resolution component" of the reservoir project, Fullwood's attorney defined "ac-

commodate" as "[a]ssist, provide electric service, road service, barges, levees, anything that would assist the oil producers and in producing their minerals."

In their post-trial briefs, the parties set out their respective positions: Fullwood argued that the District had failed to accommodate the mineral interest owners and that the combination of its actions had the effect of satisfying the "any interference" component of *Fullwood I*. The District, on the other hand, argued that (1) Fullwood failed to show that it had acted "unreasonably," citing *Fullwood I*, and (2) asserting *Fullwood I* required Fullwood to establish the elements of the *Getty* "accommodation doctrine," that Fullwood failed to prove the elements necessary to establish his right to recover damages. See *Getty Oil Company v. Jones*, 470 S.W.2d 618 (Tex.1971). Somewhat inconsistently, the District also argued in its brief that the "accommodation doctrine" did not apply because the 1981 deed expressly defined the relationship between the severed mineral estate and surface estate (the District would reassert both of these arguments, and thus the accompanying inconsistency, in its motion to correct the judgment filed in response to the court's final judgment).

After considering the briefs, the court ruled that there had "been inverse condemnation in this case." Following that ruling, the court conducted a jury trial on the issue of damages in October and signed a final judgment incorporating the jury's verdict on November 15. After the bench trial, but before the jury hearing on damages, Fullwood released his claims against Pool by an agreement which called for Pool to pay $18,-000.

On December 1 the District requested that the court make findings of fact and conclusions of law regarding its ruling that the District had inversely condemned Fullwood's mineral estate. TEX. R. CIV. P. 296. When the court failed to timely file the requested findings and conclusions, the District filed its notice of past due findings and conclusions. *Id.* 297. Although Fullwood objected to the court making such findings and conclusions, pointing to his earlier objection to the court's

conducting a bench trial on the issue and to the District's insistence that the condemnation issue was a question of law, he submitted proposed findings of facts and conclusions of law. The District objected to Fullwood's submission, alleging that the proposed findings of fact were not material to the "accommodation doctrine," and submitted its own proposed findings and conclusions. The court then drafted and filed fourteen findings of fact and a single conclusion of law to support its ruling. Neither party requested that the court file additional findings and conclusions. This appeal followed.

## ATTACKS ON THE FINDING OF INVERSE CONDEMNATION

In its first six points of error, the District attacks the court's finding that it damaged Fullwood's mineral estate by inverse condemnation. In points one, two, and four the District complains that the court based its inverse-condemnation finding on the effect of inundation on Fullwood's ability to produce the minerals. In point three, it claims that Fullwood failed to adduce sufficient evidence to establish the elements of the "accommodation doctrine." Finally, the District complains in point five that the court ruled based on a view that *Fullwood I* required it to rule as it did and in point six that the court's findings of fact are inconsistent with, and negate, its conclusion of law.

### INUNDATION AND INVERSE CONDEMNATION

In point one, the District claims that the court erred by finding that inverse condemnation occurred because the surface was inundated. In point two, the District argues that the court erred in failing to recognize that the 1981 deed precludes Fullwood from claiming that inundation resulted in an inverse condemnation.

As set out above, we held in *Fullwood I* that the 1981 deed contained an "express limitation" on the mineral estate so that "Fullwood's right to produce the minerals was made subordinate to the District's right 'to construct, maintain and operate a reservoir[.]'" *Fullwood*, No. 10–92–020–CV, slip op. at 6, 7, 963 S.W.2d at 65, 66. Thus, under the "law of the case" doctrine, inundation alone is not a sufficient basis for Fullwood's

inverse-condemnation claim. *Hudson v. Wakefield,* 711 S.W.2d 628, 630 (Tex.1986). We remanded the cause for a determination of whether the District interfered with Full-wood's access to the minerals *"beyond that reasonably necessary to inundate the Reservoir." Fullwood,* No. 10–92–020–CV, slip op. at 8, 963 S.W.2d at 66 (emphasis added). The court was required to answer *this* question during the bench trial on Fullwood's condemnation claim.[1] The District has failed to demonstrate that the court erroneously ignored our directions in *Fullwood I,* and we will not presume that it rendered judgment on a theory precluded by our earlier opinion. *See Hudson,* 711 S.W.2d at 630; *Texas Dept. of Public Safety v. Raffaelli,* 905 S.W.2d 773, 776 (Tex.App.-Texarkana 1995, no writ h); *Harrell v. Harrell,* 700 S.W.2d 645, 647 (Tex. App.-Corpus Christi 1986, no writ). Thus, points one and two are overruled.

In point four, the District complains that there is insufficient evidence to support the court's finding that inundation increased the cost of production and that this finding is immaterial. We agree that the finding is immaterial under our prior opinion. *Fullwood,* No. 10–92–020–CV, slip op. at 7–8, 963 S.W.2d at 65–66; *see also Fleet v. Fleet,* 711 S.W.2d 1, 2 (Tex.1986) (jury issue is immaterial if it "cannot alter the effect of the verdict"). Thus, this point does not present an argument on which effective relief may be granted and is overruled.

THE *GETTY* ACCOMMODATION DOCTRINE

In point three, the District claims that the evidence is insufficient to establish the elements of the "accommodation doctrine" as set out in *Getty Oil Company. Getty,* 470 S.W.2d at 622. The District asserts that our reference to *Getty* and the concept of accommodation in *Fullwood I* had the effect of holding that the accommodation doctrine was applicable to this suit and placing the burden on Fullwood to prove its elements. *See Full-*

*wood,* No. 10–92–020–CV, slip op. at 6–8, 963 S.W.2d at 65–66. Thus, the District argues, the evidence is insufficient because Fullwood failed to show an existing use of the surface which the District could reasonably accommodate by using some established alternative practice for building and maintaining the reservoir. *Getty,* 470 S.W.2d at 622.

We do not read *Fullwood I* as does the District. We recognized there that the parties had expressly defined their relationship in the 1981 deed, thus taking this dispute out of the implied rules set out in *Getty. Fullwood,* No. 10–92–020–CV, slip op. at 6, 963 S.W.2d at 65 ("We hold that the subordination clause contained in the 1981 deed was ... an *express limitation of the dominant estate"* (emphasis added)); *also Tarrant County Water Control v. Haupt,* 854 S.W.2d 909, 911 (Tex.1993); *Getty,* 470 S.W.2d at 621. Even if the accommodation doctrine were to apply, the District's complaint would not be valid because "[a]ny failure of proof [on the elements of accommodation] falls on the Water District [as the surface owner], not the plaintiffs [as the mineral estate owner]." *Haupt v. Tarrant County Water Control,* 870 S.W.2d 350, 353 (Tex.App.—Waco 1994, no writ).

Regardless, *Fullwood I* held that Fullwood could not recover for damages to his mineral estate caused solely by the District's *reasonable* actions in creating the reservoir. However, if Fullwood demonstrated that the District engaged in conduct which went beyond those acts reasonably necessary to the construction and operation of the reservoir, he was entitled to prevail on his inverse-condemnation claim. *Fullwood,* No. 10–92–020–CV, slip op. at 8, 963 S.W.2d at 66 (citing *Chambers–Liberty Counties Navigation Dist. v. Banta,* 453 S.W.2d 134, 137 (Tex. 1970); *Warren Petroleum Corp. v. Martin,* 153 Tex. 465, 271 S.W.2d 410, 413 (1954)). We did not require that he establish the elements of the Getty accommodation doc-

---

1. Our directions to the court in *Fullwood I* are consistent with the Supreme Court's decision to "recognize a cause of action for inverse condemnation where the government acts to gain an unfair advantage against an economic interest of an owner." *State v. Biggar,* 873 S.W.2d 11, 13

(Tex.1994) (internal quotation punctuation omitted). We decided *Fullwood I* in November 1992. *Biggar* was handed down in March 1994, six months before the bench trial on Fullwood's inverse-condemnation claims.

trine to prevail on his claim. *See id.* Therefore, the District's complaint about the sufficiency of the evidence to establish those elements is irrelevant to the merits of this appeal. *Hudson,* 711 S.W.2d at 630; *Raffaelli,* 905 S.W.2d at 776; *Harrell,* 700 S.W.2d at 647. Accordingly, point three is overruled.

DICTATED RULING

In point five, the District contends that the trial court erred by finding that the District had damaged a portion of Fullwood's mineral estate because the court appeared to conclude that *Fullwood I* dictated such a ruling. However, the District has not shown that it raised this theory in the trial court. Thus, it cannot attack the court's ruling on this basis before this court. TEX. R. APP. P. 52(a); *Regan v. Lee,* 879 S.W.2d 133, 136 (Tex. App.—Houston [14th Dist.] 1994, no writ); *Winters v. Arm Refining Co., Inc.,* 830 S.W.2d 737, 738–39 (Tex.App.-Corpus Christi 1992, writ denied). Additionally, such a complaint is necessarily based on a presumption that the court incorrectly applied the law set out in our opinion, a presumption we decline to indulge.[2] *See Hudson,* 711 S.W.2d at 630; *Raffaelli,* 905 S.W.2d at 776; *Harrell,* 700 S.W.2d at 647. Point five is overruled.

INCONSISTENT FINDINGS AND CONCLUSION

In point six the District complains that the court's findings of fact are inconsistent with, and negate, its sole conclusion of law. Again, the District has not shown where it raised this theory in the trial court and it cannot raise the argument before us for the first time. TEX. R. APP. P. 52(a); *Winters,* 830 S.W.2d at 738–39. Point six is overruled.

TITLE TO THE MINERAL ESTATE

In point seven, the District attacks the court's failure to provide in the judgment that it will acquire title to the mineral estate upon payment of the damages awarded to Fullwood. In the sole "conclusion of law," the court stated, "[b]ased on the Court of

Appeals opinion in this cause, and based on other facts in this cause, *at least a large part* of the mineral interest was *damaged* by inverse condemnation." (Emphasis added). In *Fullwood I,* we specifically ruled that the deed did not destroy the value of the mineral estate. *Fullwood,* No. 10–92–020–CV, slip op. at 7, 963 S.W.2d at 65. The court's finding in this regard is consistent with our opinion.

Article I, section 17 of the Texas Constitution provides, in pertinent part: "No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made...." TEX. CONST. art. I, sec. 17. "It is well-settled in Texas that the 'government's duty to compensate for damaging property for public use ... [is] not dependent upon the transfer of property rights.'" *State v. Biggar,* 873 S.W.2d 11, 13 (Tex.1994) (citing *Steele v. City of Houston,* 603 S.W.2d 786, 790 (Tex.1980); *G., C. & Santa Fe R.R. Co. v. Eddins,* 60 Tex. 656, 663 (1884)). Thus, a landowner may recover damages even if an actual "taking" did not occur. *Id.*

The District has not attacked the court's conclusion that the mineral estate was damaged, not taken. *Regan,* 879 S.W.2d at 136; *Winters,* 830 S.W.2d at 738–39. Whether the mineral estate was "damaged" versus "taken" is a question of intrusion and, thus, factual in nature even though the court makes the determination as a matter of law. *Compare McCammon & Lang Lumber Co. v. Trinity & B.V. Ry. Co.,* 104 Tex. 8, 133 S.W. 247, 249 (1911) (a taking "includes the appropriation of that thing ... by actual physical possession") with *DuPuy v. City of Waco,* 396 S.W.2d 103, 108 (Tex.1965) ("by damages is meant every loss or diminution of what is a man's own, occasioned by the fault of another, whether this results directly to the thing owned, or be but an interference with the right which the owner has ...." (internal quotations omitted)); *also Scott v. City of Robinson,* 404 S.W.2d 330, 332 (Tex.Civ. App.-Waco 1966, writ ref'd n.r.e.). Although

---

2. The court's sole conclusion of law states:
   Based on the Court of Appeals opinion in this cause, and based on other facts in this cause, at least a large part of the mineral interest was damaged by inverse condemnation.

We read the court's reference to *Fullwood I* as an acknowledgement by the court that it was bound by our earlier holding and was applying the law as announced to the facts as the court found them.

the court made the finding in a "conclusion of law," the essential factual essence of the finding remains unchanged. *McAshan v. Cavitt*, 149 Tex. 147, 229 S.W.2d 1016, 1020 (1950); *Shirey v. Albright*, 404 S.W.2d 152, 157 (Tex.Civ.App.-Corpus Christi 1966, writ ref'd n.r.e.). Thus, the District is required to defeat the court's factual finding that the estate was "damaged" instead of "taken." *Id.; Des Champ v. Featherston*, 886 S.W.2d 536, 541 (Tex.App.-Austin 1994, no writ); *Wade v. Anderson*, 602 S.W.2d 347, 349 (Tex. Civ.App.—Beaumont 1980, writ ref'd n.r.e.). Having failed to do so, it may not complain that the court rendered a judgment consistent with that finding. *See Steele*, 603 S.W.2d at 789–90; *Trinity River Authority v. Chain*, 437 S.W.2d 887, 892–93 (Tex.Civ. App.-Beaumont 1969, writ ref'd n.r.e.). Point seven is overruled.

## ATTACKS ON THE AMOUNT OF THE DAMAGES AWARD

In point eight, the District argues that the court should have reduced the damages awarded to Fullwood for a variety of reasons. Although this is a multifarious point, we will address each contention in turn. TEX. R. APP. P. 74(p).

MEASURE OF DAMAGES

Initially, citing the doctrines of estoppel by judgment, res judicata and collateral estoppel, the District contends that Fullwood's damages should have been calculated in proportion to the $60,000 condemnation award for his royalty interest under the 1943 lease. Under the District's theory, the $60,000 award represented 1/24th of the total value of the mineral estate. Thus, according to the District, Fullwood's total recovery should be limited to $1,440,000 (24 × $60,000).

However, the District did not plead these theories in its answer; therefore, they are waived. TEX. R. Civ. P. 94; *Austin Transp. Study v. Sierra Club*, 843 S.W.2d 683, 688 (Tex.App.-Austin 1992, writ denied). Additionally, the District has waived these claims because, by failing to provide argument on how the theories apply to this cause, it has not adequately briefed the issues. TEX. R. APP. P. 74(f); *Missouri Pacific R. Co. v.*

*Lemon*, 861 S.W.2d 501, 528 (Tex.App.-Houston [14th Dist.] 1993, writ dism'd by agr.). For both reasons, this contention is overruled.

ONE SATISFACTION RULE

The District next claims that it is entitled to an offset for three different sums of money under the "one satisfaction rule." *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 5 (Tex.1991). "The one satisfaction rule applies to prevent a plaintiff from obtaining more than one recovery for the same injury." *Id.* at 7.

The District first argues that the judgment should be reduced by the amount Fullwood has been paid as royalties under the Samedan unitization agreement. It reasons that Fullwood is being compensated by those payments for "the same oil" as the jury's award for damages in this cause. However, the one satisfaction rule applies to compensation from multiple tort-feasors for the same *injury*. *Id.* Royalty payments under a new lease with an unrelated entity do not compensate for an injury, rather, they are payments made to the mineral estate owner for the use of his production rights.

Next, the District argues that the judgment should be reduced by $60,000 to reflect the amount awarded to Fullwood as compensation for his royalty interest under the 1943 lease. Again, it argues that this sum compensates Fullwood for the "same oil." However, the $60,000 award compensated Fullwood for the destruction of his interest under the lease, the second award compensated him for damages to his access to the minerals as the mineral owner. These are injuries to two distinct interests owned by Fullwood. Thus, he sustained two injuries and the one satisfaction rule is not applicable to these two awards. *Id.*

Finally, The District claims that it is entitled to an offset for the $18,000 Fullwood received from Pool Oil Company in settlement of his claims against Pool. Fullwood sued Pool claiming that it had damaged his mineral estate by "junking" the well holes when it plugged the oil wells in the lake bed area by leaving non-drillable material in the bores and had unlawfully interfered with his ability to obtain a permit from the Railroad

Commission. Between the bench trial on inverse condemnation and the jury trial on damages, Pool paid Fullwood $18,000 to settle their dispute. All of the acts Fullwood alleged against Pool are included in the acts alleged against the District. The injury Fullwood claimed he suffered from those acts—acts that "proximately caused an unreasonable and unnecessary impairment, restriction and denial of access to the mineral estate"—are identical to the injuries he claimed were inflicted on him by the District. Thus, we agree with the District that Fullwood has received a double recovery to this extent. *Id.* Therefore, we sustain point 8(c) and will reform the judgment to credit the $18,000 paid to Fullwood by Pool.

## EVIDENTIARY RULINGS COMPLAINTS

In points nine, ten, and eleven, the District complains that the court excluded evidence relating to the Samedan Unit production. These points are listed in the points of error section of the brief, but are not mentioned again. The District has not provided record cites, arguments, or authorities to support these complaints and, thus, we consider them abandoned. TEX. R.App. P. 74(f); *Emery v. Rollins*, 880 S.W.2d 237, 238 (Tex.App.-Houston [14th Dist.] 1994, writ denied). Points nine, ten and eleven are overruled.

## FULLWOOD'S CROSS–POINT

Fullwood raises one cross-point complaining that the court refused to hold a jury trial on all issues, including whether the District had unreasonably interfered with his limited right of access to the minerals. However, he raises this point conditioned on our sustaining the District's evidentiary sufficiency complaints and remanding the cause for a new trial. Because we have overruled all of the District's points on which Fullwood conditioned his cross-point, we will not address it.

## DISPOSITION

Because we have sustained the District's claim relating to the $18,000 settlement with Pool, we reform judgment as follows. The second full paragraph on page three of the judgment is reformed to read:

Prior to the beginning of the trial on October 10, 1994, the Plaintiffs and Defendant POOL COMPANY announced to the Court that the Plaintiffs and POOL COMPANY had settled all issues between them. Following said announcement, the Court entered an Agreed Order of Dismissal With Prejudice as to POOL COMPANY. However, because the settlement moneys paid by POOL COMPANY are compensation for the same injury as that caused by the Defendant TARRANT COUNTY WATER CONTROL AND IMPROVEMENT DISTRICT NUMBER ONE, the amount found by the jury as the reduction in the fair market value of the mineral estate resulting from the inverse condemnation is reduced to reflect an Eighteen Thousand and No/100 ($18,000) Dollars credit.

The second full paragraph on page four of the judgment is reformed to read:

It is further ORDERED, ADJUDGED and DECREED by the Court that P.D. FULLWOOD, INDIVIDUALLY and D/B/A P.D. FULLWOOD OPERATING COMPANY, LA PESCA PRODUCTIONS, INC. and HAUPT, INC., jointly, have and recover actual damages from TARRANT COUNTY WATER CONTROL AND IMPROVEMENT DISTRICT NUMBER ONE in the sum of One Million Nine Hundred Twenty–Nine Thousand Sixty Five and No/100 ($1,929,065.00) Dollars plus pre-judgment interest at the rate of ten (10%) percent per annum on the sum of One Million Nine Hundred Twenty–Nine Thousand Sixty Five and No/100 ($1,929,065.00) Dollars, from May 1, 1989, until the date of this Judgment.

The third full paragraph on page four of the judgment is likewise reformed to read:

It is further ORDERED that the judgment hereby rendered shall bear interest at the rate of ten (10%) percent compounded annually on each of the following sums: (a) the sum of Sixty Thousand and No/100 ($60,000) Dollars plus pre-judgment interest thereon (as set forth above) and (b) the sum of One Million Nine Hundred Twenty–Nine Thousand Sixty Five and No/100

($1,929,065.00) Dollars plus pre-judgment interest thereon (as set forth above), from the date of judgment until paid.

Otherwise, all of the District's complaints are rejected and its points overruled. As reformed, the judgment is affirmed.

Before Justice Cummings, and Justice Vance

Reformed and affirmed

Opinion delivered and filed March 20, 1996

Do not publish